IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
|---|---|---|
| v. | : | DATE FILED:_____ |
| BRIAN HARTLINE<br>BARRY BEKKEDAM | : | VIOLATIONS: |
| | : | 18 U.S.C. § 371 (conspiracy to defraud the United States - 1 count) |
| | : | 18 U.S.C. § 1031 (Troubled Asset Relief Program fraud - 1 count) |
| | : | 18 U.S.C. § 1001 (false statements to the federal government – 2 counts) |
| | : | 18 U.S.C. § 1343 (wire fraud – 2 counts) |
| | : | 18 U.S.C. § 1344 (bank fraud – 1 count)<br>18 U.S.C. § 2 (aiding and abetting) |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At all times relevant to this indictment:

1.  Defendant BRIAN HARTLINE was President and Chief Executive Officer of NOVA Bank ("NOVA"), a Pennsylvania state-chartered savings bank, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), and NOVA Financial Holdings, Inc., a bank holding company registered as the parent company for NOVA. NOVA Financial Holdings, Inc. owns NOVA, and the parent company is owned by investors.

2.  Defendants BARRY BEKKEDAM and BRIAN HARTLINE and others

known to the Grand Jury formed NOVA in or about 2002. Defendant BARRY BEKKEDAM was the initial chairman of the board of directors of NOVA and NOVA Financial Holdings, Inc. BEKKEDAM remained NOVA's chairman until in or about 2005 and chairman of NOVA Financial Holdings, Inc. until in or about 2007.

3. Defendant BARRY BEKKEDAM owned and operated a company named Ballamor Capital Management ("Ballamor") that offered financial advisory services to high net worth individuals. Defendant BARRY BEKKEDAM advised Ballamor clients to invest in NOVA. Ballamor clients came to own a large portion of NOVA stock.

4. Because of his role as ex-chairman of NOVA, and because his clients owned a substantial portion of the bank, defendant BARRY BEKKEDAM wielded substantial control over NOVA and was able to influence NOVA to make large loans to Ballamor, Ballamor's clients, and to BEKKEDAM at very favorable terms.

5. The Federal Deposit Insurance Corporation ("FDIC") was the federal agency responsible for, among other things, insuring bank deposits, bank supervision and examination, and managing receiverships of failed financial institutions.

6. The Federal Reserve Board of Governors ("Federal Reserve") was the federal agency charged with supervising and regulating banking institutions to ensure the safety and soundness of the nation's banking and financial system. The Federal Reserve was the federal agency charged with overseeing Nova Financial Holdings, Inc.

7. The United States Department of the Treasury's Troubled Asset Relief Program ("TARP") was created by the Emergency Economic Stabilization Act of 2008 and was designed, among other things, to help stabilize the financial system in the wake of the 2008 financial crisis. One of the sub-programs created under TARP was the Capital Purchase

Program ("CPP"), in which the federal government, through TARP, invested in financial institutions in exchange for preferred shares in those institutions.

8. The Pennsylvania Department of Banking ("PADOB") was the Pennsylvania state agency charged with ensuring that the deposits at state-chartered banks and other financial institutions are safe.

9. G.L., known to the Grand Jury, was a Florida businessman who ran a company named Banyon Investment Fund and related companies ("Banyon"). F.P., known to the Grand Jury, worked for G.L. at Banyon.

### Bekkedam's Relationship with G.L.

10. In or about March 2009 defendant BARRY BEKKEDAM met G.L., who, through his company Banyon, was unwittingly investing his own money, and money he raised from investors, in a South Florida-based investment fraud scheme, in which invested money was used to pay earlier investors.

11. In or about April 2009, defendant BARRY BEKKEDAM and G.L. reached an agreement where defendant BARRY BEKKEDAM agreed to direct Ballamor clients to invest in Banyon. From in or about April 2009 to in or about October 2009, defendant BEKKEDAM, and others, induced Ballamor clients to invest more than $30 million in Banyon. In exchange, G.L.:

    a. Paid BEKKEDAM approximately $1.2 million;

    b. Agreed to invest in Ballamor and provide BEKKEDAM and Ballamor a $5 million line of credit;

    c. Agreed to assume approximately $10 million of BEKKEDAM's outstanding debt to investors in Ballamor; and

      d.      Agreed to invest approximately $18 million in NOVA.

## THE CONSPIRACY

12. Between in or about May 2009 and in or about January 2010, in the Eastern District of Pennsylvania and elsewhere, defendants

**BRIAN HARTLINE, and
BARRY BEKKEDAM,**

conspired and agreed, together, and with others known and unknown to the Grand Jury, to knowingly and intentionally defraud the United States, particularly the Troubled Asset Relief Program, and to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1031.

## MANNER AND MEANS

It was part of the conspiracy that:

13. Defendants BARRY BEKKEDAM and BRIAN HARTLINE devised a scheme to obtain over $13 million in funds from the United States, by making false representations about the assets of NOVA Financial Holdings, Inc., and by arranging bogus financial transactions.

### NOVA's Financial Difficulties

14. In or about 2008 NOVA, like many other banks, faced financial difficulties because it had made numerous bad loans and investments in securities commonly referred to as collateral debt obligations (commonly referred to as "CDOs"). Subsequently, NOVA lost its "well capitalized" FDIC rating. Because of under-capitalization, NOVA faced a risk of failure and its investors risked losing their investments in NOVA.

15. In or about October 2008, NOVA, through NOVA Financial Holdings,

Inc., applied for more than $13 million from TARP's Capital Purchase Program to inject much-needed capital into the bank. Subsequently, on or about June 10, 2009 the United States Department of Treasury approved NOVA for participation in the Capital Purchase Program, contingent upon "a capital injection of $15 million" into NOVA.

### Bekkedam and Hartline Orchestrate a $5 Million Fraudulent Transaction to Secure TARP Money

16. On or about June 30, 2009, G.L. had not invested any money in NOVA, and NOVA needed this capital infusion to meet the funding requirements to qualify for TARP money.

17. During the days leading up to June 30, 2009, defendants BARRY BEKKEDAM and BRIAN HARTLINE decided to make it appear that G.L. was investing new capital in NOVA by arranging a circular transaction. NOVA would loan G.L. $5 million and G.L. would immediately transfer that same $5 million to NOVA's parent company. If the circular nature of the transaction was kept secret to anyone outside of NOVA, it would appear that NOVA had an outside investor putting new capital into the bank, when it did not.

18. On or about June 30, 2009, defendant BRIAN HARTLINE had NOVA approve a $5 million unsecured loan for G.L. This was one of NOVA's largest loans. However, defendant BRIAN HARTLINE hid the purpose for the loan from NOVA's loan committee. At approximately 11:54 a.m., NOVA wired $5 million from an operating account to G.L.'s bank account in Florida. At approximately 1:00 p.m., about one hour after receiving this loan, G.L. wired this $5 million to an account at NOVA that the bank used to receive investments in NOVA's parent company, NOVA Financial Holdings, Inc.

19. At the time NOVA loaned the $5 million to G.L. for the circular loan,

defendant BRIAN HARTLINE knew that G.L. was unwilling to invest in NOVA unless someone else provided the money. Indeed, after NOVA loaned G.L. $5 million, defendant BRIAN HARTLINE attempted to procure for G.L. a $9 million loan from another bank so that G.L. would also invest this money in NOVA.

### Bekkedam and Hartline Represent that G.L. Invested $5 million in NOVA

20. Following NOVA's June 30, 2009 loan to G.L., defendant BRIAN HARTLINE represented and had other NOVA employees represent to various bank regulators, including the PADOB, the FDIC, and the Department of the Treasury, that NOVA had raised $5 million in capital through G.L.'s investment.

21. Following the June 30, 2009 loan, defendant BARRY BEKKEDAM represented to various Ballamor clients that G.L. had "infused" $5 million in NOVA, which would help it secure $13.5 million of TARP funding.

### Bekkedam and Hartline Orchestrate Other Circular Transactions to Secure TARP Money

22. The Department of the Treasury told NOVA it had until October 21, 2009, to raise the money necessary to be eligible to receive the $13.5 million in TARP funds. However, by October 21, 2009, NOVA still had not raised sufficient capital.

23. In or about October 2009, defendant BARRY BEKKEDAM solicited Ballamor client A.B., known to the Grand Jury, to invest $4.5 million in NOVA and Banyon. Defendant BARRY BEKKEDAM told A.B. he would direct NOVA to loan A.B. the money to make these two investments.

24. On or about October 21, 2009, defendant BARRY BEKKEDAM arranged for NOVA to loan A.B. $4.5 million. After NOVA completed this loan, defendant BARRY

6

BEKKEDAM arranged for $2 million of this total to be invested in Banyon and $2.5 million to be used to buy NOVA stock.

25. In or about December 2009, defendant BRIAN HARTLINE solicited C.G., known to the Grand Jury, to invest in NOVA. After being told that C.G. did not want to use his own money to invest in NOVA, defendant BRIAN HARTLINE arranged for NOVA to loan C.G. $500,000 to buy NOVA stock.

26. Following the loans to A.B. and C.G., defendant BRIAN HARTLINE represented to the Department of Treasury that the $2.5 million loaned to A.B. and the $500,000 loaned to C.G. represented new capital invested in the bank.

27. In or about December 2009, KPMG, NOVA's auditor, and others, raised concerns about the G.L., A.B., and C.G. transactions. In an attempt to obscure the fact that NOVA loaned G.L. $5 million to invest in NOVA, defendant BRIAN HARTLINE fabricated a document related to the G.L. loan, and provided this fabricated document to NOVA's attorney.

    a. When determining whether to make any loan a NOVA employee created a document called a "Risk Assessment Summary," (hereinafter "RAS") that summarized information about the borrower, the loan, and potential risks associated with the loan.

    b. On or about June 30, 2009, NOVA employee J.M., known to the Grand Jury, drafted a RAS for the G.L. loan. J.M., who was not told that NOVA made the $5 million loan so that G.L. could send the money back to NOVA, wrote in the RAS that: "[G.L.] (Borrower) is requesting a $5,000,000.00 Non-Revolving Commercial Line of Credit from Nova Bank. The loan will be used by [G.L.] for investment purposes."

    c. Sometime later, defendant BRIAN HARTLINE changed the RAS to read: "[G.L.] (Borrower) is requesting a $5,000,000.00 Non-Revolving Commercial Line of

7

Credit from Nova Bank. The loan will be used by [G.L.] for a short term bridge loan. The borrower will use these funds to replace funds that were used to purchase and improve real estate located in Devon, Montgomery County." This statement was false. Defendant BRIAN HARTLINE did not replace the RAS drafted by J.M. with his altered RAS in the official loan file for the G.L. loan.

        d.    In or about January 2010, defendant BRIAN HARTLINE sent the altered RAS to NOVA's attorney as part of the attorney's review of the propriety of the $5 million loan to G.L. Defendant BRIAN HARTLINE did not send the attorney the authentic RAS or tell the attorney about the circular nature of the G.L. loan transaction. Based on the fabricated RAS, NOVA's attorney wrote an opinion letter stating that the G.L. loan did not violate any law or regulation applicable to the bank.

        28.    Through their scheme, defendants BARRY BEKKEDAM and BRIAN HARTLINE fraudulently made it appear to the Department of the Treasury and others that NOVA was more financially sound than it actually was because three people had infused new capital totaling approximately $8 million in the bank when, in fact, these were not new investments in NOVA and NOVA had merely received its own money back.

## OVERT ACTS

In furtherance of the conspiracy, defendants BRIAN HARTLINE and BARRY BEKKEDAM, and others known to the Grand Jury, committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1. On or about May 28, 2009, NOVA Financial Holdings, Inc.'s secretary, C.H., known to the Grand Jury, emailed BARRY BEKKEDAM's employee, L.R., known to the Grand Jury, bank forms that G.L. needed to complete to facilitate a $5 million loan from NOVA to G.L.

2. On or about June 29, 2009, L.R. emailed defendant BRIAN HARTLINE, G.L.'s date of birth and phone number, information that was necessary for NOVA to complete the $5 million loan.

3. On or about June 30, 2009, defendant BRIAN HARTLINE and NOVA approved a $5 million unsecured loan to G.L. At approximately 12:00 p.m., NOVA Vice President, Thomas Patterson, charged elsewhere, wired $5 million from a NOVA operating account to G.L.'s account in Florida.

4. On or about June 30, 2009 at approximately 1:00 p.m., G.L. wired $5 million to a NOVA escrow account to purchase stock in NOVA Financial Holdings, Inc.

5. On or about July 21, 2009, NOVA Financial Holdings, Inc. secretary C.H., mailed an application package to the Federal Reserve and PADOB, on behalf of NOVA, stating that G.L. invested $5 million in NOVA Financial Holdings, and intended to invest a total of $18 million.

6. On or about September 24, 2009, defendant BARRY BEKKEDAM sent a letter to various Ballamor clients stating: "Ballamor's clients and relationships infused $5 million

into [NOVA] in June and have signed terms sheets for an additional $13 million. Nova was also granted TARP of $13.5 million which is inexpensive capital we can utilize . . . ."

7. On or about October 15, 2009, defendant BARRY BEKKEDAM sent an email to G.L. stating that to complete an investment of $10 million, G.L. was only going to need to provide NOVA $3 million out of his own pocket because NOVA had already loaned him $5 million and was going to lend him another $2 million.

8. On or about October 21, 2009, defendant BARRY BEKKEDAM sent an email to L.R. and one of G.L.'s employees, stating that NOVA needed $5 million from G.L. to collect $13.5 million of TARP funds. Defendant BEKKEDAM said that if G.L. sent this $5 million to NOVA, within two weeks NOVA would send him back $2 million and send him back the remaining balance by January 15, 2010.

9. On or about December 15, 2009, defendant BRIAN HARTLINE advised the Department of Treasury that NOVA had "completed raising over $10 million," including $2.5 million from A.B. and $500,000 from C.G. Defendant HARTLINE failed to inform the Department of Treasury that NOVA had loaned A.B. and C.G. the money for these investments.

10. On or about January 29, 2010, defendant BRIAN HARTLINE sent the fabricated Risk Assessment Summary for the G.L. loan to NOVA's attorney, as part of a plan to convince the attorney that the $5 million loan to G.L. was unconnected to G.L.'s $5 million investment in NOVA.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

THE GRAND JURY FURTHER CHARGES THAT:

At all times relevant to this indictment:

1. Paragraphs One through Eleven and Thirteen through Twenty-Eight and Overt Acts One through Ten of Count One of this indictment are incorporated here.

2. Between in or about May 2009 and in or about December 2009, in the Eastern District of Pennsylvania and elsewhere, defendants

**BRIAN HARTLINE, and
BARRY BEKKEDAM**

knowingly executed, and attempted to execute, and aided and abetted the execution of, a scheme with the intent to defraud the United States, and to obtain money or property by means of false pretenses, representations, or promises, in connection with a grant, contract, subcontract, subsidy, loan, guarantee, and other form of federal assistance, that is an attempt to obtain $13,472,000 from the Troubled Asset Relief Program submitted by NOVA Bank ("NOVA"), which attempt included false representations of infusions of capital when, in fact, defendants BRIAN HARTLINE and BARRY BEKKEDAM, and others participated in a scheme to use NOVA's own money to fraudulently give the appearance of outside investment.

In violation of Title 18, United States Code, Sections 1031 and 2.

## COUNT THREE AND FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times relevant to this indictment:

1. Paragraphs One through Eleven and Thirteen through Twenty-Eight and Overt Acts One through Ten of Count One of this indictment are incorporated here.

2. On or about each of the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**BRIAN HARTLINE, and
BARRY BEKKEDAM,**

in a matter within the jurisdiction of the United States Department of Treasury, an agency of the executive branch of the United States, knowingly and willfully made, and aided and abetted the making of, materially false, fictitious, and fraudulent statements and representations, each statement or representation constituting a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Three | June 30, 2009 | BRIAN HARTLINE told, and directed employees of NOVA to tell, the Department of Treasury that NOVA had raised $5 million of new capital through an investment by G.L. |
| Four | December 15, 2009 | BRIAN HARTLINE told the Department of Treasury that NOVA had raised $10 million of new capital, including a $2.5 million investment by A.B. and a $500,000 investment by C.G. |

In violation of Title 18, United States Code, Sections 1001 and 2.

## COUNTS FIVE AND SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs One through Eleven and Thirteen through Twenty-Eight and Overt Acts One through Ten of Count One of this indictment are incorporated here.

2. Defendant BARRY BEKKEDAM and Ballamor had clients in the Eastern District of Pennsylvania and elsewhere, with whom Bekkedam communicated by telephone, mail, and electronic mail.

### THE SCHEME

3. From in or about June 30, 2009 to in or about December 2009, defendant

**BARRY BEKKEDAM**

devised and intended to devise a scheme to defraud individuals investing in NOVA by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

It was part of the scheme that:

4. Defendant BARRY BEKKEDAM knew that NOVA needed to raise new capital to be eligible for TARP funds.

5. Defendants BARRY BEKKEDAM and BRIAN HARTLINE decided to make it appear that G.L. was investing new capital in NOVA by arranging a circular transaction. NOVA would loan G.L. $5 million and G.L. would immediately transfer that same $5 million to NOVA's parent company.

6. Following the June 30, 2009 loan, defendant BARRY BEKKEDAM represented to Ballamor clients that G.L. had "infused" $5 million in NOVA, which would help it secure $13.5 million of TARP funding.

13

7. On or about September 24, 2009, defendant BARRY BEKKEDAM sent a letter to various Ballamor clients stating: "Ballamor's clients and relationships infused $5 million into [NOVA] in June and have signed terms sheets for an additional $13 million. Nova was also granted TARP of $13.5 million which is inexpensive capital we can utilize . . . ."

8. In or about September and October 2009, defendant BARRY BEKKEDAM contacted Ballamor clients and attempted to induce them to invest in NOVA by falsely claiming that G.L. had invested $5 million in NOVA when BEKKEDAM knew that NOVA had in fact loaned G.L. this money.

9. In or about October 2009, defendant BARRY BEKKEDAM convinced A.B. to borrow $4.5 million from NOVA so that he could use the money, in part, to buy NOVA stock.

10. On or about each of the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendant

**BARRY BEKKEDAM,**

for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Five | October 21, 2009 | An email from a Ballamor employee to NOVA for the purpose of facilitating the loan from NOVA to A.B. |
| Six | October 22, 2009 | An email from a Ballamor employee to A.B. instructing him to sign and return the NOVA loan documents. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs One through Eleven and Thirteen through Twenty-Eight and Overt Acts One through Ten of Count One of this indictment are incorporated here.

2. NOVA Bank ("NOVA") was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation, certificate no. 27148.

3. From in or about May 2009 to in or about February 2010, in the Eastern District of Pennsylvania, and elsewhere, defendants

**BRIAN HARTLINE, and
BARRY BEKKEDAM**

knowingly executed, and attempted to execute, and aided and abetted the execution of, a scheme to defraud NOVA, and to obtain monies owned by and under the care, custody, and control of that bank by means of false and fraudulent pretenses, representations, and promises.

### THE SCHEME

4. On or about June 30, 2009, defendants BRIAN HARTLINE and BARRY BEKKEDAM had NOVA loan G.L. $5 million he could use to immediately invest in the bank. Defendant HARTLINE concealed from bank employees the true purpose for the loan.

5. In order to have NOVA complete this loan by June 30, 2009, defendant BRIAN HARTLINE circumvented standard bank procedures in place for approval of a loan this large.

6. On or about October 22, 2009, defendants BRIAN HARTLINE and BARRY BEKKEDAM had NOVA loan A.B. $4.5 million he could use to immediately invest in NOVA and Banyon. Defendant HARTLINE concealed from bank employees that a portion of this loaned money, $2.5 million, would be used to buy NOVA stock, and again, HARTLINE circumvented standard bank procedures in place for approval of a loan this large.

7. On or about December 16, 2009, defendant BRIAN HARTLINE had NOVA loan C.G., a NOVA customer, $500,000, to immediately invest in NOVA.

8. In or about December 2009, defendant BRIAN HARTLINE, as President and CEO of NOVA, had NOVA pay defendant BARRY BEKKEDAM $250,000 purportedly to find new investors for NOVA.

9. On or about June 9, 2010, defendant BRIAN HARTLINE wrote a letter to NOVA's auditor, KPMG, falsely stating that NOVA loaned G.L. $5 million to complete a residence in Devon, Pennsylvania, and that the loans to A.B. and C.G. were not made to fund an investment in NOVA.

In violation of Title 18, United States Code, Sections 1344 and 2.

A TRUE BILL:

_____
GRAND JURY FOREPERSON

_____
ZANE DAVID MEMEGER
United States Attorney